**FILED**
CLERK, U.S. DISTRICT COURT

12/2/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____JB_____ DEPUTY

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

January 2020 Grand Jury

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>              v.<br><br>JAMES NATE BELL,<br>REGINA PIEHL,<br>MICHAEL EDWARDS,<br>SARA SAMHAT, and<br>JAMES BRADFORD,<br><br>              Defendants. | SACR20-18(A)-JVS<br><br>F̲ I̲ R̲ S̲ T̲<br>S̲ U̲ P̲ E̲ R̲ S̲ E̲ D̲ I̲ N̲ G̲<br>I̲ N̲ D̲ I̲ C̲ T̲ M̲ E̲ N̲ T̲<br><br>[18 U.S.C. § 1347(a)(2): Health Care Fraud; 42 U.S.C. § 1320a-7b(b): Illegal Remunerations in Connection with Federal Health Care Programs; 18 U.S.C. § 1341: Mail Fraud; 18 U.S.C. § 1957: Engaging in Monetary Transactions in Criminally Derived Property Over $10,000; 18 U.S.C. § 1503: Obstruction of Justice; 18 U.S.C. § 1518(a): Obstruction of Criminal Investigation of Health Care Offense; 18 U.S.C. §§ 981 and 982 and 28 U.S.C. § 2461(c): Criminal Forfeiture] |

///

///

///

///

///

1     The Grand Jury charges:

2             COUNTS ONE THROUGH TWENTY-ONE

3               [18 U.S.C. §§ 1347(a)(2), 2]

4        [DEFENDANTS BELL, PIEHL, EDWARDS, AND SAMHAT]

5 A.  INTRODUCTORY ALLEGATIONS

6     At times relevant to this First Superseding Indictment:

7     Defendants and Related Entities

8     1.  Defendant JAMES NATE BELL was a resident of Anaheim,

9 California.  Defendant BELL was the beneficial owner and manager of a

10 pharmacy known as Professional Compounding Pharmacy LLC

11 ("Professional Compounding"), located at 721 W. Whittier Boulevard,

12 Suite H, La Habra, California, with a second location at 570 Central

13 Avenue, Brea, California.  Professional Compounding specialized in

14 the preparation of compound medications, especially compound creams,

15 based upon prescriptions authorized by physicians, nurse

16 practitioners, and physician's assistants, which typically yielded

17 extremely high rates of reimbursement from government and private

18 insurance companies.

19     2.  Defendant BELL was also the beneficial owner and manager of

20 two successive and functionally equivalent purported medical

21 marketing companies, Algia Pharmaceuticals MR&D, located at 1440 East

22 Stearns Avenue, La Habra, California, and Algia, Inc., located at 560

23 Peralta Hill Drive, Anaheim Hills, California ("Algia").  Algia did

24 not actually provide any medical marketing or advertising services

25 for Professional Compounding or for any other pharmacy.  Rather, it

26 served as a financial conduit that enabled Professional Compounding

27 indirectly to pay commissions and/or kickbacks to sales agents and

28 medical marketers who solicited prescriptions for compound creams

from physicians, nurse practitioners, and physician's assistants, and then routed these scripts, once obtained, to Professional Compounding for fulfillment.

3.    James Bradford was a resident of Mission Viejo, California. Bradford was the President, Chief Executive Officer ("CEO") and one of the beneficial owners of a medical marketing company known as Product For Doctors, Inc. ("PFD"), which was located at 27001 La Paz Road, Suite 348, Mission Viejo, California, and did business with Algia and Professional Compounding.  Among its other business activities, PFD engaged sales or marketing agents who recruited physicians, nurse practitioners, and physician's assistants to write prescriptions for compound creams for patient beneficiaries, which prescriptions were then routed back to PFD and to pharmacies such as Professional Compounding and Mesa Pharmacy, Inc. ("Mesa") to be filled at lucrative rates of reimbursement.  Through his management and operation of PFD, Bradford and his partners received and paid commissions for the referral of prescriptions for compound creams, and other compounded medications, to Professional Compounding and Mesa.

4.    Mesa, located at 19013 Sky Park Circle, Suite D, Irvine, California, also specialized in the preparation of compound medications, especially compound creams.  NHS Pharma Inc., located at 1323 West Colton Avenue, Suite 120, Redlands, California, was the billing company for Mesa that, through a related entity NHS Pharma Sales, Inc., facilitated and enabled Mesa to pay commissions and/or kickbacks to sales agents and medical marketers who solicited prescriptions for compound creams from physicians, nurse

practitioners, and physician's assistants, and then routed these scripts, once obtained, to Mesa for fulfillment.

5.   Defendant REGINA PIEHL was a resident of Los Angeles, California.  Defendant PIEHL served as a sales agent/marketer for PFD and in that capacity engaged physicians, nurse practitioners, and physician's assistants to write prescriptions for compound creams that were routed by defendant PIEHL to PFD and ultimately to Professional Compounding for fulfillment.  In exchange, PFD paid defendant PIEHL commissions for referrals of prescriptions for compound creams.  Defendant PIEHL also served as the owner and operator of a medical care spa known as Coastal Therapy Group, Inc. ("CTG"), which was located at 16818 Hawthorne Boulevard, in Lawndale, California in a building owned by defendant PIEHL.

6.   In her capacity as a sales agent/marketer of prescriptions for compound creams and related compound medications for Professional Compounding, defendant PIEHL operated three different business entities through which she received and paid commissions for the referral of prescriptions to Professional Compounding, namely: (1) Worldwide Marketing Group ("WMG"), located at 350 Bellino Drive, Pacific Palisades, California; (2) Global Management Network, Inc. ("GMN"), located at 16818 Hawthorne Boulevard, Lawndale, California; and (3) Century Therapy Group, Inc., located at 350 Bellino Drive, Pacific Palisades, California.

7.   Defendant MICHAEL EDWARDS was a medical doctor and a resident of Huntington Beach, California.  With the assistance of defendant PIEHL, defendant EDWARDS set up and supervised sham clinical pain studies at two different clinics he established that treated patients only once or twice a week, usually on the weekends.

4

One of these weekend clinics was located at CTG (which was owned by
defendant PIEHL) ("the CTG clinic"), and the second weekend clinic
was located at 3142 East Plaza Boulevard, Unit T, National City,
California ("the National City clinic").  Defendant EDWARDS's
clinical studies purported to analyze the effectiveness of compound
creams, and related compound medications, as an alternative to
commonly-prescribed oral medications, such as opioids, for the
treatment of pain.  In fact, defendant EDWARDS's pain studies
exclusively targeted a particular class of patients who had
government or private insurance that paid lucrative reimbursement
rates for compounded creams and related medications, and their
purpose was simply to generate a high and recurring volume of
prescriptions for compounded creams for those patients participating
in the studies.

8.    Defendant EDWARDS received substantial commission payments
from defendant PIEHL for having referred compound drug prescriptions
to Professional Compounding through defendant PIEHL and PFD.
Defendant PIEHL disguised these commission payments to defendant
EDWARDS as supposed charitable contributions to defendant EDWARDS's
alleged non-profit research organization, the Foundation for the
Permanent Elimination of Nerve Pain and Disability ("the
Foundation"), located at 21039 South Figueroa Street, Suite 201,
Carson, California, or as payments to one of defendant EDWARDS's
business entities, namely, the Mobil Medical Records Association
("MMRA"), or Mobil Medical Records Technology ("MMRT"), both located
at the same address as the Foundation.

9.    Defendant SARA SAMHAT served as a marketer who assisted
defendant EDWARDS in the routing of prescriptions for compounded

5

creams and related medications to defendant PIEHL, to PFD, and to Professional Compounding.  Defendants EDWARDS and SAMHAT received commission payments from defendant PIEHL for the routing of these prescriptions for compounded medications to PFD and to Professional Compounding.  These commission payments were directed in many instances by defendant PIEHL to MMRT, which was controlled by defendant EDWARDS and which possessed a bank account on which defendant SAMHAT was the signer.

10.  "Physician 1" was a licensed California physician, who was hired and paid by defendant EDWARDS to work at the National City clinic.  Defendant EDWARDS encouraged Physician 1, directly and indirectly, to prescribe compound creams or related compound medications to treat patients recruited by defendant EDWARDS and his staff to attend the clinic as part of defendant EDWARDS's purported pain study.

11.  Nurse Practitioner 1 ("NP 1") was a licensed California nurse practitioner, who was hired by defendant PIEHL to work with defendant EDWARDS at the CTG clinic.  Defendant PIEHL subsequently referred NP 1 to assist defendant EDWARDS in treating patients who attended defendant EDWARDS's National City clinic.  NP 1 was encouraged, directly and indirectly, by defendants PIEHL, EDWARDS and SAMHAT to prescribe compound creams or related compound medications to patients who were recruited by defendant EDWARDS and his staff, or by defendant PIEHL, to seek treatment at the two clinics through which defendant EDWARDS conducted his sham pain studies.

Compounded Medications

12.  In general, "compounding" was a practice by which a licensed pharmacist combined, mixed, or altered ingredients of a drug

6

or multiple drugs to create a drug tailored to the needs of an individual patient.  Compounded drugs were not approved by the U.S. Food and Drug Administration ("FDA"), that is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.  The California Board of Pharmacy regulated the practice of compounding in the State of California.

13.  Compounded drugs, including topical compounded creams, may be prescribed by a physician when an FDA-approved drug or ointment did not meet the health needs of a particular patient.  For example, if a patient was allergic to a specific ingredient in an FDA-approved drug, such as a dye or a preservative, a compounded drug or topical cream could be prepared that excluded the substance that triggered the allergic reaction.  Compounded drugs were available when a patient could not consume a drug by traditional means, such as an elderly patient or a child who could not swallow an FDA-approved pill and needed the drug in a liquid or cream/ointment form that was not otherwise available.

TRICARE

14.  TRICARE was a health care benefit program, as defined by 18 U.S.C. § 24(b), and a federal health care program, as defined by 42 U.S.C. § 1302a-7b(f)(1), that provided health care benefits, items, and services to Department of Defense beneficiaries world-wide, including active duty service members, National Guard and Reserve members, retirees, their families, and survivors.

15.  Express Scripts, Inc. ("ESI") was a prescription benefit plan manager that administered TRICARE's prescription drug benefits, acting at all relevant times as an agent of TRICARE.  Claims for reimbursement for services rendered or goods provided, including

covered compounded drug prescriptions, were submitted to ESI for payment by TRICARE.

16.   TRICARE provided health care benefits for certain prescription drugs, including certain topical compounded creams and ointments, that were medically necessary and prescribed pursuant to TRICARE rules and regulations.  In order to become a pharmacy entitled to submit claims for reimbursement to the TRICARE program, a pharmacy was required to execute a "PSAO Pharmacy Affiliation Authorization" under which the pharmacy agreed to comply with all applicable state and federal laws including, among other things, that no claims for reimbursement would be submitted to TRICARE for filling a prescription absent proof that the prescription followed a face-to-face examination by a physician, reflecting a bona fide doctor-patient relationship, and that the fulfilling pharmacy would collect a co-payment from the beneficiary at the time of dispensing a prescription.

17.   During the calendar years of 2013-2015, inclusive, the period of time during which defendant BELL, and others known and unknown to the Grand Jury, operated Professional Compounding, Professional Compounding had the following TRICARE claims activity, substantially all of which was for filling prescriptions for compounded creams and related compound medications:

| CALENDAR YEAR | NUMBER OF CLAIMS | AMOUNT CLAIMED | AMOUNT PAID | AVG PMT/CLAIM |
|---|---|---|---|---|
| 2013 | 62 | $60,344 | $58,004 | $936 |
| 2014 | 1342 | $5,120,445 | $4,407,585 | $3,284 |
| 2015 | 2745 | $17,477,141 | $14,707,029 | $5,358 |

18.   In early 2015, TRICARE announced that, as of the beginning of May 2015, it would no longer be reimbursing pharmacies for filling prescriptions for compound creams at the lucrative reimbursement

1  rates it had been previously providing.  As a result of this

2  impending change in TRICARE's reimbursement policy for compound

3  drugs, Professional Compounding accelerated its solicitation of

4  compound drug prescriptions in March and April 2015 from its

5  established marketers, resulting in the presentation of over 2100

6  claims for compound drug prescriptions to TRICARE, in the billed-for

7  amount of over $14 million, in these two months directly preceding

8  the TRICARE cut-off date of May 2015.

9  <u>ILWU HEALTH CARE BENEFIT PLAN</u>

10      19.   The International Longshore and Warehouse Union ("ILWU") –

11  Pacific Maritime Association Welfare Plan ("the ILWU Plan") was a

12  health care benefit program, as defined by 18 U.S.C. § 24(b), for

13  active and retired dockworkers, ship clerks, foremen and watchmen, as

14  well as their qualified dependents and survivors.  The ILWU Plan

15  provided health care benefits for hospital, medical, surgical care

16  and prescription drugs.  The ILWU Plan was a self-funded indemnity

17  plan which received contributions from employers, registered

18  employees, and the ILWU to fund the plan, the proceeds of which were

19  then used to pay health insurance benefits for plan beneficiaries.

20  Union members were generally guaranteed the maximum benefit,

21  typically 100% of the charge for covered services.

22      20.   All persons who enjoyed ILWU Plan eligibility and

23  qualified for hospital, medical and surgical benefits also typically

24  enjoyed eligibility for benefits under the ILWU Prescription Drug

25  Program.

26      21.   The ILWU Plan used OptumRX, a third-party plan

27  administrator, to process and pay prescription drug claims submitted

28  by health care providers to fill prescriptions written for ILWU Plan

beneficiaries.  The ILWU Plan ultimately funded the payment of claims submitted by providers to OptumRX that OptumRX determined were covered by the ILWU Plan, and at all relevant times OptumRX was acting as an agent of the ILWU Plan.  To bill OptumRX for prescription drugs covered under the ILWU Plan for ILWU Plan beneficiaries, a health care provider, e.g., a pharmacy, would submit a claim to OptumRX electronically on a standard claim form (Form 1500), identifying, among other things, the patient's name and identification number, diagnosis, the type of drug dispensed to the ILWU Plan member, the date of service, the charge for the service, the prescribing physician, and the provider.  OptumRX reimbursed pharmacy providers only for medically necessary prescription drugs. OptumRX sent reimbursement checks to pharmacy providers through the United States mail, and the ILWU Plan routinely paid OptumRX the full amount of these reimbursement checks sent to pharmacy providers, as well as paying OptumRX administrative fees for processing the pharmacy provider claims.

22.    In order to become a pharmacy entitled to submit claims for reimbursement to OptumRX, a pharmacy was required to execute an agreement with OptumRX, whereby it would become an OptumRX Credentialed Pharmacy.  Pursuant to this agreement, the pharmacy agreed to comply with all applicable state and federal laws relating to fraud and abuse.  Based upon guidance provided by OptumRX in its handbook, this included the requirement of avoiding, among other things, illegal remuneration schemes, script mills, and altered and forged prescriptions.

23.    Between early 2014 until the beginning of May 2015, it was well-known within the compounded drug industry, among pharmacists

10

and marketers alike, that TRICARE paid some of the highest rates of reimbursement for the fulfillment of prescriptions for compound creams, ointments, and related medications.  It was also well-known within the compounded drug industry that the ILWU Plan offered higher rates of reimbursement for compound creams than other comparable private health care providers, although generally not quite as generous as TRICARE, and the ILWU Plan continued doing so through the middle of 2016.

B.    THE FRAUDULENT SCHEME

24.    Beginning on or about a date unknown, but at least as early as on or about April 2014, and continuing to on or about August 2016, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants BELL, PIEHL, EDWARDS, and SAMHAT, together with others known and unknown to the Grand Jury, knowingly, willfully, and with the intent to defraud, executed and attempted to execute a scheme and artifice to obtain money from health care benefit programs, namely, TRICARE and the ILWU Plan, as well as other private health care benefit programs as defined under 18 U.S.C. § 24(b), by means of materially false and fraudulent pretenses and representations and the concealment of material facts in connection with the delivery of and payment for health care benefits, items, and services.

C.    MANNER AND MEANS OF THE FRAUDULENT SCHEME

25.    The fraudulent scheme operated, in substance, in the following manner:

Setting Up a Compound-Cream Prescription Mill at the CTG Clinic

a.    Defendants EDWARDS and PIEHL, and others known and unknown to the Grand Jury, agreed to take, and took, the following

11

steps, among others, to establish a compound prescription mill in which ILWU-Plan beneficiaries, along with other privately insured beneficiaries, were recruited, along with NP 1, to generate and fill multiple prescriptions for medically unnecessary compound creams that were subsequently submitted to Professional Compounding for lucrative reimbursement and to fund payments to downstream marketers:

   i.   In or about early 2014, defendant PIEHL offered NP 1 a part-time job as a nurse practitioner at a clinic at CTG. Defendant PIEHL represented to NP 1 that she was a business partner of defendant EDWARDS, and that NP 1 would be compensated between $500 and $1500 a day, as a flat rate, to do follow up visits from time to time for defendant EDWARDS's patients at CTG.  Defendant PIEHL also falsely assured NP 1 in this context that she was a licensed registered nurse and was therefore qualified to serve as a business partner of a doctor.

   ii.   Shortly after NP 1 accepted the job, NP 1 was contacted by defendant PIEHL and was asked to travel to the CTG clinic to perform follow-up visits on defendant EDWARDS's patients approximately one Saturday per month.  In that role, NP 1 was encouraged, particularly by defendant PIEHL, to prescribe compound cream medications to address the pain issues reported by defendant EDWARDS's patients, which NP 1 did.

   iii.   Defendant PIEHL would often bring the patients into the treatment room used by NP 1 with pre-printed prescription forms containing specific menu options for the prescribing of compound creams, so that NP 1 merely had to check individual boxes on the forms to ensure the recommended compound creams were prescribed.

iv.    The CTG clinic solicited patient beneficiaries from the ILWU Plan by offering payments of $200 per patient if the patients sought treatment for their pain symptoms by requesting compound cream medications, based in part on the pretense that the patients were participating in an authorized study conducted by defendant EDWARDS of the effectiveness of these compound cream medications, for which the patients were entitled to be compensated.

v.    In fact, the alleged pain study was a sham and the $200 payments served solely as a ruse to attract ILWU Plan beneficiaries and induce them to accept compound cream prescriptions, which were subsequently sent to Professional Compounding through PFD for processing by OptumRX at high rates of reimbursement. Professional Compounding subsequently paid a significant portion of the reimbursement proceeds it received from OptumRX to downstream marketers, such as PFD, which in turn forwarded these proceeds to defendants PIEHL and SAMHAT.

vi.    Defendant EDWARDS also separately treated a number of patients at the CTG clinic, all of whom were also paid $200 per visit.    Defendant EDWARDS wrote a number of compound cream prescriptions for these patients that were subsequently submitted to Professional Compounding for fulfillment, as a result of which defendant EDWARDS received substantial referral fees through defendant PIEHL.

vii.    After the ILWU Plan beneficiaries completed their initial visits at the CTG clinic with either defendant EDWARDS or NP 1, they were provided with a check for $200 by defendant PIEHL, or by others acting under defendant PIEHL's direction, which was drawn on the bank account of defendant EDWARDS's Foundation, the

1  alleged non-profit research foundation controlled by defendant
2  EDWARDS.

3      Setting Up a Second Compound-Cream Prescription Mill

4          b.   Defendants EDWARDS, PIEHL and SAMHAT, and others known
5  and unknown to the Grand Jury, agreed to take, and took, the
6  following steps, among others, to establish a second compound-cream
7  prescription mill in which TRICARE beneficiaries were recruited,
8  along with NP 1 and Physician 1, to generate and fill multiple
9  prescriptions for medically unnecessary compound creams that were
10  subsequently submitted to Professional Compounding for lucrative
11  reimbursement by TRICARE:

12          i.   In or about August 2014, as interest in
13  soliciting new ILWU Plan beneficiaries to receive compound
14  prescriptions waned, defendant EDWARDS, in consultation with
15  defendant PIEHL, decided to initiate a second sham pain study
16  targeting TRICARE beneficiaries located in the San Diego area, which
17  had a large population of elderly U.S. veterans, particularly
18  Filipino veterans.

19          ii.   To implement this purpose, defendant EDWARDS,
20  assisted by defendants PIEHL and SAMHAT, secured office space from an
21  existing chiropractic practice and set up the National City clinic in
22  around August or September 2014.  The National City clinic offered
23  treatment for pain to TRICARE beneficiaries exclusively on the
24  weekends, typically on Friday or Saturday, when defendants EDWARDS
25  and SAMHAT would travel down from Los Angeles to oversee the
26  operation of the clinic.

27          iii.   The National City clinic solicited patient
28  beneficiaries from TRICARE by offering payments of $200 per patient

14

1    if the patients sought treatment for their pain symptoms at the

2    clinic and filled out paperwork for the purported study, based in

3    part on the pretense that the patients were participating in a study

4    conducted by defendant EDWARDS's alleged non-profit Foundation

5    concerning the effectiveness of pain therapies that provided an

6    alternative to standard oral medications (such as opioids), focusing

7    in particular on compound creams.

8              iv.  In fact, the Foundation's alleged pain study was

9    a sham, and while defendant EDWARDS hired and paid office staff

10   through his Foundation to obtain paperwork relating to the patients'

11   pain history, defendant EDWARDS never consistently collected or

12   retained data concerning the effectiveness of the treatments or

13   medications they received through the National City clinic.  In

14   effect, the $200 payments served solely as a ruse to attract TRICARE

15   plan beneficiaries and to induce many of them to accept compound

16   cream prescriptions, which were subsequently submitted to

17   Professional Compounding for fulfillment at extremely high rates of

18   reimbursement.

19             v.   The most important written information obtained

20   by defendant EDWARDS's office staff from their intake with the

21   TRICARE patients participating in the purported study was their

22   gathering of insurance information and military identification, as

23   reflected by the fact that office staff was instructed as the first

24   item of their "Photo Copy Checklist" to ensure that a copy of each

25   patient's TRICARE card and military ID was maintained in the file for

26   subsequent billing.

27             vi.  Aside from hiring marketers and staff at the

28   National City clinic through the Foundation to solicit TRICARE plan

15

1  beneficiaries and obtain necessary identifying TRICARE insurance

2  information, defendant EDWARDS, with the assistance of defendant

3  PIEHL, hired NP 1 and Physician 1, as well as other physicians and

4  physician's assistants, to work at the clinic on weekends, and

5  defendants EDWARDS and PIEHL jointly paid compensation to NP 1 and

6  Physician 1 for their work at the clinic on a per diem basis through

7  various corporations that they separately controlled.

8          vii. In connection with NP 1's work at the National

9  City clinic, NP 1 was encouraged by defendant EDWARDS, as well as by

10 others working at the clinic, directly and indirectly to prescribe a

11 nearly identical set of compound-cream medications to virtually all

12 of the patients NP 1 treated from a pre-printed form that was

13 provided to NP 1 by the clinic.  Shortly after NP 1 completed

14 treating patients, NP 1 occasionally overheard defendant EDWARDS

15 informing patients that they would be getting paid.

16         viii.    When defendant EDWARDS engaged Physician 1

17 to work at the National City clinic, defendant EDWARDS informed

18 Physician 1 that, in collaboration with defendant SAMHAT, defendant

19 EDWARDS set up the clinic to study the effectiveness of compound-

20 cream medications for the treatment of pain.  Defendants EDWARDS and

21 SAMHAT provided Physician 1 with a small number of prescription

22 templates from particular pharmacies that contained specific menu

23 options for the prescribing of compound-cream medications, several of

24 which they recommended as having been highly effective in the past.

25         ix.  Relying in significant part on the

26 recommendations of defendants EDWARDS and SAMHAT, who was acting in

27 coordination with defendant EDWARDS, Physician 1 wrote several

28 hundred prescriptions for compound creams for numerous TRICARE

1  beneficiaries between approximately October 2014 and January 2015,

2  the vast majority of which were forwarded to Professional Compounding

3  for fulfillment through PFD.  The prescriptions from Physician 1

4  resulted in several million dollars in reimbursements from TRICARE to

5  Professional Compounding and in payments by Professional Compounding

6  to downstream marketers such as PFD, which in turn provided

7  commission/kickback payments to defendant PIEHL, among others.

8            x.   After NP 1 and Physician 1 completed writing

9  compound cream prescriptions for individual patients at the National

10  City clinic, the prescriptions and patient files were transmitted to

11  the custody of defendant SAMHAT, who reviewed the prescriptions and

12  in some instances told Physician 1 to check certain boxes on the

13  prescription forms that Physician 1 had supposedly overlooked or

14  omitted.  The prescriptions were then routed by defendant SAMHAT, and

15  by office staff working under the direction of defendants EDWARDS and

16  SAMHAT, to PFD before finally being transmitted to Professional

17  Compounding.  In several instances, defendants SAMHAT and EDWARDS

18  also caused the insurance cards and military identification cards of

19  TRICARE beneficiaries, containing personal identifying information

20  (such as social security numbers), to be faxed electronically to PFD,

21  along with their compound cream prescriptions.

22            xi.  On multiple occasions, the prescriptions that

23  were written by NP 1 and Physician 1 for compound creams were

24  modified after they were turned over to the custody of defendants

25  SAMHAT and EDWARDS, such that the modified prescriptions reflected

26  that between six and eleven refills of the compound cream

27  prescriptions were authorized, when in fact NP 1 and Physician 1 only

28  actually authorized refills of these prescriptions on an as-needed

17

basis.  The vast majority of these fraudulently modified prescriptions for refills were submitted to ESI by Professional Compounding for payment by TRICARE.

xii.    When the issue arose as to which party was going to bear responsibility for paying for the compound creams that were prescribed through the pain study conducted at the National City clinic, defendant SAMHAT falsely assured patients that the clinic would be providing patients with a free trial of these creams for at least a month, while defendant EDWARDS told TRICARE beneficiaries not to worry because they would not be required to make any out-of-pocket payments for these creams even if their insurance provider was billed for the creams.  In fact, defendants EDWARDS and SAMHAT both knew that: (1) TRICARE would be paying extremely high rates of reimbursement for these compound cream claims, as much as $3,000-$10,000 per tube of cream; (2) TRICARE had not agreed to waive their beneficiaries' obligation to make a co-payment on these compound cream prescription claims; and (3) TRICARE had neither been informed of, nor agreed to, paying for compound creams prescribed in connection with defendant EDWARDS's purported pain study.

xiii.    Defendant EDWARDS also separately treated a number of patients on his own at the National City clinic, all of whom were also paid $200 per visit, and he wrote a number of compound cream prescriptions for these patients that were subsequently submitted for fulfillment, as a result of which defendant EDWARDS received commission payments through the Foundation from defendant PIEHL and her related entities.

xiv.    After the TRICARE beneficiaries completed their initial visits at the National City clinic with either defendant

18

EDWARDS, Physician 1 or NP 1, and other physicians and physician's assistants, the beneficiaries were provided with checks for $200 by defendant EDWARDS, or by others acting at defendant EDWARDS's direction, which were drawn on the bank account of the Foundation.

PFD Accepts Compound Prescriptions For TRICARE Beneficiaries

c. Beginning in or about September 2014, defendant PIEHL contacted the principals of PFD, including Bradford, in order to secure PFD's agreement to accept a large volume of compound cream prescriptions for TRICARE beneficiaries that were being generated by the National City clinic, and defendant PIEHL and Bradford subsequently took the following steps to ensure that these prescriptions would be provided to PFD and then forwarded to Professional Compounding for submission to TRICARE at lucrative reimbursements rates:

i. In early September 2014, defendant PIEHL reported to the principals of PFD, including Bradford, that she had located a great new program in San Diego, California involving clinics that focused on prescribing compound creams for TRICARE beneficiaries, and she wanted to refer these prescriptions to PFD for processing with the compounding pharmacies with which PFD was affiliated, including Professional Compounding.

ii. In internal discussions among the principals of PFD, there were concerns that PFD would not be able to accept this business, because TRICARE was a federally funded-health insurance program and receipt and/or payment of commissions or referral fees to marketers for the submission of such prescriptions to pharmacies would potentially violate the federal anti-kickback statute. In fact, the sales commission agreement between PFD and Algia, the

19

marketing arm of Professional Compounding, expressly provided that there shall be "[n]o Commission for Government-Paid Prescriptions." However, defendant BELL falsely assured the principals of PFD that payment of commissions to PFD by Algia would not run afoul of the federal anti-kickback statute because Algia was an independent marketing company, separate from Professional Compounding, such that PFD was not effectively receiving commission payments from a pharmacy.

   iii. Notwithstanding these issues, the principals of PFD accepted the referral of a large number of compound prescriptions for TRICARE beneficiaries from the National City clinic between October 2014 and May 2015, which were subsequently submitted to Professional Compounding for fulfillment and reimbursement by TRICARE.

   iv.  As a result of PFD's decision, PFD received over $9 million in commission payments for the referral of compound prescriptions for TRICARE beneficiaries from Professional Compounding between October 2014 and May 2015, and defendant PIEHL received over $2.5 million in commission payments from PFD, a significant portion of which she transferred to defendants EDWARDS and SAMHAT through various entities that they jointly controlled.

   v.  After TRICARE significantly reduced its reimbursement rates for compound creams starting in the beginning of May 2015, PFD discontinued its submission to Professional Compounding of compound prescriptions for TRICARE beneficiaries.  However, PFD continued to accept and submit compound prescriptions to Professional Compounding for ILWU Plan beneficiaries that originated from the CTG clinic through approximately April 2016, because OptumRX continued to

pay reimbursements on behalf of ILWU Plan beneficiaries for compound

cream prescriptions at relatively high levels through April 2016.

### Fraudulent Claims Submitted to TRICARE and the ILWU Plan

d.    Defendant BELL, and others known and unknown to the

Grand Jury, used, and directed employees of Professional Compounding

to accept compounded drug prescription forms that were distributed to

marketers and doctors for the purpose of filling compounded drug

prescriptions.  The forms identified multiple compounded drug

formulations, purportedly to treat pain, stretch marks, migraines,

and wounds, and to promote general wellness, that were included on

the forms because they provided the maximum possible TRICARE and/or

ILWU Plan reimbursements rather than because they addressed

legitimate, individual patient needs and were medically necessary.

e.    Defendant BELL, aided and abetted by defendants

PIEHL, EDWARDS, and SAMHAT, and others known and unknown to the Grand

Jury, filled and caused to be filled compounded drug prescriptions

and caused false and fraudulent claims for reimbursement to be

submitted to TRICARE and to the ILWU Plan, and to other private

health care programs, claims that were demonstrably spurious because,

among other things:

i.    Substantially all of the prescriptions were

faxed or electronically sent to Professional Compounding and PFD from

marketers to whom Professional Compounding and PFD had agreed to pay

commissions/kickbacks disguised as advertising or marketing fees,

while these prescriptions were solicited from doctors and patients

who were paid by marketers principally in order to enable these

marketers to realize kickbacks or referral fees on each claim that

was reimbursed by TRICARE, the ILWU Plan, or other private health
care benefit programs.

ii.    Substantially all of the prescriptions were
identically or nearly identically described on the same or similar
prescription form or pad that identified pre-formulated compounds,
and these forms typically originated with Professional Compounding or
with other pharmacies that were paying commission fees and soliciting
prescriptions that were refined by the marketers to maximize
reimbursement rates.

iii.    Few, if any, of the beneficiaries for whom the
prescriptions were provided ever paid, nor did Professional
Compounding attempt or ever intend to collect, any co-payment as
required by TRICARE.

iv.    The relatively small number of purported
prescribing physicians recurred on multiple prescriptions and on
multiple refills of prescriptions, even though in several instances
these physicians did not in fact actually prescribe multiple refills
but indicated only that refills were authorized on an as-needed
basis.

v.    Professional Compounding conducted little, if
any, due diligence upon receipt of the prescriptions to verify
whether, in fact, the beneficiaries actually sought the prescribed
medications.  Indeed, in several instances Professional Compounding
either deliberately refrained from calling beneficiaries to avoid
giving notice to beneficiaries or, in other instances, ignored
beneficiaries' complaints that the prescriptions were either
ineffective or not needed at all, especially after the initial round
of prescriptions had been sent out.

1      vi.      The compounded formulations were virtually

2  identical for all of the beneficiaries regardless of their purported

3  illnesses, and none of the prescriptions was specifically formulated

4  based on the individualized needs, medical history, allergic reaction

5  potential, contraindications, or conflicts with other prescription

6  medications that were unique to each particular beneficiary.

7      vii.      In submitting reimbursement claims for the

8  compound cream prescriptions filled at Professional Compounding,

9  defendant BELL generally billed the health insurance providers based

10  upon his claimed use of a relatively expensive base cream ingredient

11  known as Versepro, when in fact defendant BELL routinely used a

12  significantly less expensive base cream in preparing the compound

13  cream mixtures, which if accurately reported to TRICARE or the ILWU

14  Plan would have warranted a lower reimbursement amount.

15      Defendant BELL's Attempt to Conceal the TRICARE Kickbacks

16      f.   In or about August 20, 2016, in connection with

17  responding to TRICARE's audit inquiries regarding the business

18  records and activities of Professional Compounding, defendant BELL

19  requested a meeting with Bradford to discuss concerns he had

20  regarding the fact that Professional Compounding had been improperly

21  paying millions of dollars in kickbacks to PFD based on adjudicated

22  claims paid by TRICARE to Professional Compounding.

23      g.   In this meeting, defendant BELL conceded that he was

24  not supposed to be paying referral or commission fees to PFD on

25  TRICARE claims (as expressly prohibited in the existing contract

26  between PFD and Algia), but he proposed that PFD execute a new,

27  backdated contract with Algia, pursuant to which all monies that

28  Algia historically paid to PFD would be accounted for as commission

23

payments for referrals of compound scripts reimbursed by private or PPO insurance plans, not by TRICARE.

h.    Based on this new proposed fictitious contract between Algia and PFD, Algia would make commission payments to PFD, and other marketers, "equivalent to 97.5% of adjudicated amounts paid by non-government sponsored private insurance for compounded prescription drugs," as opposed to the 43% commission payment provided for in the actual existing contract between Algia and PFD.  By falsely revising the contract in this way, and seeking to backdate it, defendant BELL indicated that he could explain to those reviewing his business accounts that the monies he paid to PFD related to referral fees owed based on reimbursement of private insurance claims, rather than based on referral fees for reimbursement of TRICARE claims.

i.    In providing a copy of this fictitious contract to Bradford and one of his partners, defendant BELL assured the PFD participants that if they agreed to execute this new proposed fictitious contract, defendant BELL would be able to survive government scrutiny of his business practices at Professional Compounding and Algia and the PFD principals would never have to hear about this again.

j.    As a result of the fraudulent scheme described above, TRICARE suffered financial losses of approximately $19.2 million and the ILWU Plan suffered losses of approximately $2.8 million.

D.    EXECUTIONS OF THE FRAUDULENT SCHEME

26.    On or about the dates set forth below, in Orange and Los Angeles Counties, within the Central District of California, and elsewhere, defendants BELL, PIEHL, EDWARDS, and SAMHAT, together with others known and unknown to the Grand Jury, aiding and abetting each

other, knowingly and willfully executed and attempted to execute the

fraudulent scheme described above, by submitting and causing to be

submitted to TRICARE and the ILWU Plan the following false and

fraudulent claims:

| COUNT | DATE | CLAIM | DEFENDANTS |
|-------|------|-------|------------|
| ONE | 2/9/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $16,673 for compounded drug prescription in the name of beneficiary F.G. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| TWO | 2/9/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary C.G. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| THREE | 3/9/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $16,673 for compounded drug prescription in the name of beneficiary F.G. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| FOUR | 3/9/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary C.G. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| FIVE | 3/31/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary D.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |

| COUNT | DATE | CLAIM | DEFENDANTS |
|-------|------|-------|-----------|
| SIX | 3/31/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary C.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| SEVEN | 3/31/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $16,673 for compounded drug prescription in the name of beneficiary C.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| EIGHT | 4/23/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary D.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| NINE | 4/23/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $4,443 for compounded drug prescription in the name of beneficiary C.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| TEN | 4/23/15 | Claim submitted by Professional Compounding to TRICARE in the approximate amount of $16,673 for compounded drug prescription in the name of beneficiary C.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| ELEVEN | 7/9/15 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $1000 for compounded drug prescription in the name of beneficiary P.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |

| COUNT | DATE | CLAIM | DEFENDANTS |
|---|---|---|---|
| TWELVE | 7/9/15 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $1000 for compounded drug prescription in the name of beneficiary B.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| THIRTEEN | 7/21/15 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $1000 for compounded drug prescription in the name of beneficiary P.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| FOURTEEN | 12/7/15 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $11,958 for compounded drug prescription in the name of beneficiary S.S | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| FIFTEEN | 1/4/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $11,958 for compounded drug prescription in the name of beneficiary B.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| SIXTEEN | 1/29/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary B.S. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| SEVENTEEN | 2/2/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary A.C. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |

| COUNT | DATE | CLAIM | DEFENDANTS |
|---|---|---|---|
| EIGHTEEN | 2/2/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary V.C. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| NINETEEN | 2/16/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary A.C. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| TWENTY | 2/16/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $12,078 for compounded drug prescription in the name of beneficiary V.C. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| TWENTY-ONE | 4/8/16 | Claim submitted by Professional Compounding to ILWU Plan in the approximate amount of $12,080 for compounded drug prescription in the name of beneficiary A.C. | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |

COUNTS TWENTY-TWO THROUGH TWENTY-SEVEN

[18 U.S.C. §§ 1341, 2(b)]

[DEFENDANTS BELL, PIEHL, EDWARDS, AND SAMHAT]

27.  The Grand Jury realleges and incorporates paragraphs 1 through 23 of this First Superseding Indictment here.

A.  THE MAIL FRAUD SCHEME

28.  Beginning on or about a date unknown to the Grand Jury, but at least as early as in or about April 2014, and continuing through at least on or about August 2016, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, defendants BELL, PIEHL, EDWARDS, and SAMHAT, together with others known and unknown to the Grand Jury, knowingly and with the intent to defraud, devised, participated in, executed and attempted to execute a scheme and artifice to obtain money and property from TRICARE and the ILWU Plan, and from other health care benefit programs, by means of materially false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

B.  MANNER AND MEANS OF THE MAIL FRAUD SCHEME

29.  The mail fraud scheme operated, in substance, by the means and in the manner alleged in paragraph 25 of this First Superseding Indictment, which is incorporated here.

C.  USE OF THE MAILS

30.  On or about the dates set forth below, in Los Angeles and Orange Counties, within the Central District of California and elsewhere, the defendants identified below, for the purpose of executing and attempting to execute the above-described scheme to defraud, willfully caused the items below to be placed in an

29

authorized depository for mail matter to be sent and delivered by the United States Postal Service, according to the directions thereon:

| COUNT | DATE | ITEM MAILED | DEFENDANTS |
|---|---|---|---|
| TWENTY-TWO | 2/5/15 | TRICARE payment, check no. 8327230, in the approximate amount of $298,641 and payable to Professional Compounding Pharmacy was mailed from ESI offices located in Maryland Heights, MO to Professional Compounding Pharmacy, located La Habra, CA | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| TWENTY-THREE | 3/5/15 | TRICARE payment, check no. 8333105, in the approximate amount of $418,910 and payable to Professional Compounding Pharmacy was mailed from ESI offices located in Maryland Heights, MO to Professional Compounding Pharmacy, located in La Habra, CA | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| TWENTY-FOUR | 4/30/15 | TRICARE payment, check no. 8344629, in the approximate amount of $1,361,464 and payable to Professional Compounding Pharmacy was mailed from ESI offices located in Maryland Heights, MO to Professional Compounding Pharmacy, located La Habra, CA | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |

| COUNT | DATE | ITEM MAILED | DEFENDANTS |
|-------|------|-------------|------------|
| TWENTY-FIVE | 5/14/15 | TRICARE payment, check no. 8347615, in the approximate amount of $2,999,915 and payable to Professional Compounding Pharmacy was mailed from ESI offices located in Maryland Heights, MO to Professional Compounding Pharmacy, located La Habra, CA | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS SARA SAMHAT |
| TWENTY-SIX | 10/25/15 | ILWU Plan payment, check no. 564983, in the approximate amount of $74,076 and payable to Professional Compounding Pharmacy was mailed from OptumRX offices located in Schaumberg, IL to Professional Compounding Pharmacy located in Brea, CA | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |
| TWENTY-SEVEN | 3/17/16 | ILWU Plan payment, check no. 8497885, in the approximate amount of $106,382 and payable to Professional Compounding Pharmacy was mailed from OptumRX offices located in Cypress, CA to Professional Compounding Pharmacy located in Brea, CA | JAMES NATE BELL REGINA PIEHL MICHAEL EDWARDS |

COUNTS TWENTY-EIGHT THROUGH FORTY

[42 U.S.C. § 1320a-7b(b)(2)(A); 18 U.S.C. § 2(b)]

[DEFENDANTS BELL, PIEHL, AND BRADFORD]

31.   The Grand Jury realleges and incorporates by reference paragraphs 1 through 23 of this First Superseding Indictment here.

32.   On or about the dates set forth below, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, the defendants identified below knowingly and willfully offered to pay, paid, and caused to be offered and paid remuneration to marketers, namely, the following payments, which constituted kickbacks in exchange for providing prescriptions to Professional Compounding or Mesa for which payment could be made in whole and in part under a federal health care program, namely, TRICARE, as follows:

| COUNT | DATE | DEFENDANT | ITEM | APPROXIMATE AMOUNT |
|-------|------|-----------|------|--------------------|
| TWENTY-EIGHT | 2/12/15 | BELL | Check no. 1017 to entity PFD, with the memo line "Feb 5th-11th, 2015," from JP Morgan Chase account ending in 0852 in the name of Algia, Inc. ("JPMC 0852") and signed by defendant BELL | $140,316 |
| TWENTY-NINE | 2/20/15 | PIEHL | Check no. 1037 to entity MMRT from Open Bank account ending in 1860 in the name of WMG ("OB 1860") and signed by defendant PIEHL | $19,400 |
| THIRTY | 2/20/15 | PIEHL | Check no. 376 to entity MMRA from Union Bank account ending in 0486 in the name of GMN ("UB 0486") and signed by defendant PIEHL | $20,000 |

| COUNT | DATE | DEFENDANT | ITEM | APPROXIMATE AMOUNT |
|---|---|---|---|---|
| THIRTY-ONE | 3/12/15 | BELL | Wire transfer, reference no. ending in 071E, to entity PFD with memo "Aug 29th –Sep11th," from JPMC 0852 caused by defendant BELL | $406,014 |
| THIRTY-TWO | 3/23/15 | PIEHL | Check no. 392 to entity MMRT from Bank of America account ending in 0486 in the name of GMN ("BofA 0486") signed by defendant PIEHL | $19,070 |
| THIRTY-THREE | 3/26/15 | PIEHL | Check no. 677 to entity the Foundation from Union Bank account ending in 4558 signed by defendant PIEHL | $4000 |
| THIRTY-FOUR | 3/27/15 | BELL | Wire transfer, reference no. ending in 086E, to entity PFD from JPMC 0852 caused by defendant BELL | $687,616 |
| THIRTY-FIVE | 4/17/15 | BELL | Wire transfer, reference no. ending in 107E, to entity PFD from JPMC 0852 caused by defendant BELL | $760,501 |
| THIRTY-SIX | 4/17/15 | BRADFORD | Check no. 6403 to entity CTG from Bank of America account ending 9702 in the name of PFD ("BofA 9702") signed by R.V. | $35,684 |
| THIRTY-SEVEN | 4/23/15 | PIEHL | Check No. 442 to entity MMRT from BofA 0486 and signed by defendant PIEHL | $26,200 |
| THIRTY-EIGHT | 4/24/15 | BELL | Wire transfer, reference number ending in 114E, to entity PFD from JPMC 0852 caused by defendant BELL | $795,414 |

33

| COUNT | DATE | DEFENDANT | ITEM | APPROXIMATE AMOUNT |
|---|---|---|---|---|
| THIRTY-NINE | 5/29/15 | BRADFORD | Check No. 6266 to entity Marvel Marketing Group LLC with memo "Comm" from Bank of America account ending in 2269 ("BofA 2269") signed by defendant BRADFORD | $23,970.32 |
| FORTY | 5/29/15 | BRADFORD | Check No. 6269 to James Bradford with memo "Comm." from BofA 2269 signed by defendant BRADFORD | $6,500 |

COUNTS FORTY-ONE THROUGH FORTY-NINE

[42 U.S.C. § 1320a-7b(b)(1)(A); 18 U.S.C. § 2(b)]

[DEFENDANTS PIEHL, EDWARDS, SAMHAT AND BRADFORD]

33.   The Grand Jury realleges and incorporates paragraphs 1 through 23 of this First Superseding Indictment here.

34.   On or about the dates set forth below, in Los Angeles and Orange Counties, within the Central District of California, and elsewhere, the defendants identified below knowingly and willfully solicited and received remuneration, namely, the following payments, which constituted kickbacks in exchange for providing prescriptions to Professional Compounding or Mesa for which payment could be made in whole and in part under a federal health care program, namely, TRICARE, as follows:

| COUNT | DATE | DEFENDANT | ITEM | APPROXIMATE AMOUNT |
|---|---|---|---|---|
| FORTY-ONE | 3/4/15 | PIEHL | Check No. 6164 to entity WMG from BofA 9702 and signed by D.L. | $33,884 |
| FORTY-TWO | 3/8/15 | EDWARDS | Check no. 1047 to entity MMRA from OB 1860 signed by defendant PIEHL | $16,800 |
| FORTY-THREE | 3/9/15 | EDWARDS | Check no. 1050 to entity the Foundation from OB 1860 and signed by defendant PIEHL | $6,000 |
| FORTY-FOUR | 3/23/15 | SAMHAT | Check no. 1052 to entity MMRT from OB 1860 and signed by defendant PIEHL | $17,000 |
| FORTY-FIVE | 4/5/15 | SAMHAT | Check no. 0488 to entity MMRT from BofA 0486 signed by defendant PIEHL | $5,100 |

| COUNT | DATE | DEFENDANT | ITEM | APPROXIMATE AMOUNT |
|-------|------|-----------|------|--------------------|
| FORTY-SIX | 4/19/15 | SAMHAT | Check no. 441 to entity MMRT from BofA 0486 signed by defendant PIEHL | $16,400 |
| FORTY-SEVEN | 4/24/15 | BRADFORD | Wire transfer, reference number ending in 114E, to entity PFD from JPMC 0852 caused by Bell | $795,414 |
| FORTY-EIGHT | 5/14/15 | PIEHL | Check no. 6556 to entity CTG from BofA account ending in 9702 signed by R.V. | $22,000 |
| FORTY-NINE | 5/27/15 | BRADFORD | Wire transfer, reference number ending in 9741, to entity InGen Solutions, Inc. from Wells Fargo Bank account ending in 0557 caused by NHS Pharma Sales, Inc. | $108,936.57 |

COUNTS FIFTY THROUGH FIFTY-THREE

[18 U.S.C. §§ 1957, 2]

[DEFENDANT BELL]

35.    The Grand Jury realleges and incorporates paragraphs 1 through 23 of this First Superseding Indictment here.

36.    On or about the following dates, in Orange County, within the Central District of California, and elsewhere, defendant BELL, knowing that the funds involved represented the proceeds of some form of unlawful activity, knowingly engaged in, aided and abetted, and willfully caused the following monetary transactions, affecting interstate commerce, in criminally derived property of a value greater than $10,000, such property having, in fact, been derived from a specified unlawful activity, namely, mail fraud as alleged above, in violation of Title 18, United States Code, Section 1341:

| COUNT | DATE | FINANCIAL TRANSACTION |
|---|---|---|
| FIFTY | 2/23/15 | Transfer of approximately $92,855 from JP Morgan Chase Bank account ending in number 4060 in the names of defendant BELL and CV ("JPMC 4060") to Renick Cadillac by means of check no. 1214, payable to Renick Cadillac, dated 2/22/15 |
| FIFTY-ONE | 5/21/15 | Transfer of approximately $500,000 from JPMC 0852 to Morgan Stanley account in the name of James N. Bell ending in account no. 1405 through a wire transfer, reference no. ending in 141E |
| FIFTY-TWO | 6/24/15 | Transfer of approximately $2,600,000 from JPMC 0852 to Morgan Stanley account in the name of James N. Bell ending in account no. 1405, through a wire transfer, reference no. ending in 175E |
| FIFTY-THREE | 9/16/15 | Transfer of approximately $3,927,014 from JPMC 4060 to Alliance Mutual Escrow, Inc., through a wire transfer, reference no. ending in 258E |

COUNT FIFTY-FOUR

[18 U.S.C. § 1518(a)]

[DEFENDANT BELL]

37.   The Grand Jury realleges and incorporates paragraphs 1 through 23 and subparagraphs 25(f)-(i) of this First Superseding Indictment here.

38.   On or about August 20, 2016, in Orange County, within the Central District of California, and elsewhere, defendant BELL willfully attempted to prevent, obstruct, mislead, and delay the communication to a criminal investigator of information and records relating to commission payments made by Algia to PFD, which were violations of a Federal health care offense, namely, illegal remuneration for federal health care referrals, in violation of Title 42, United States Code, Section 1320a-7b(b).  Specifically, after receiving an administrative subpoena seeking contracts between Professional Compounding and marketers between January 2014 and August 2016, defendant BELL drafted and attempted to persuade the principals of PFD to execute a fictitious contract reflecting a purported agreement in 2014 between Algia and PFD, pursuant to which Algia would pay a 97.5% commission rate to PFD for referral to Professional Compounding of compound prescriptions funded by private insurance, so that it would appear that all monies that Algia historically paid to PFD could be accounted for as commission payments for referrals of compound prescriptions reimbursed by private or PPO insurance plans, not by TRICARE.

COUNT FIFTY-FIVE

[18 U.S.C. § 1503]

[DEFENDANT PIEHL]

39.   The Grand Jury realleges and incorporates paragraphs 1 through 23 of this First Superseding Indictment here.

40.   From on or about July 11, 2019 to on or about July 17, 2019, in Los Angeles County, within the Central District of California, and elsewhere, defendant PIEHL corruptly endeavored to influence, obstruct, and impede the due administration of justice. Specifically, after receiving a federal grand jury subpoena on or about July 11, 2019 seeking records concerning payments from defendant PIEHL's entities, defendant PIEHL: endeavored to create evidence that would falsely show that defendant PIEHL and Edwards had a written contract, pursuant to which monies that defendant PIEHL's entities had paid to Edwards's entities as illegal kickbacks would be misleadingly recast as equity investments in, or loans to Edwards's entities, requiring scheduled payments by Edwards's entities to defendant PIEHL's entities as returns on investment or repayments of loans.  To further her obstruction, defendant PIEHL proposed to Edwards that: (1) Edwards write a fake contract falsely indicating that defendant PIEHL had either loaned money to or invested money in MMRA or MMRT; and (2) Edwards start paying defendant PIEHL money immediately so they could characterize these transfers as payments for defendant PIEHL's loans to or investment in MMRA or MMRT.

FORFEITURE ALLEGATION ONE

[18 U.S.C. § 982 and 28 U.S.C. § 2461(c)]

1.     Pursuant to Rule 32.2(a), Fed. R. Crim. P., notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(7) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of any of the offenses set forth in any of Counts One through Twenty-One or Twenty-Eight through Forty-Nine of this First Superseding Indictment.

2.     Any defendant so convicted shall forfeit to the United States of America the following:

(a)  All right, title, and interest in any and all property, real or personal, that constitutes or is derived, directly or indirectly, from the gross proceeds traceable to the commission of any offense of conviction; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.     Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), and Title 18, United States Code, Section 982(b), any defendant so convicted shall forfeit substitute property, up to the total value of the property described in the preceding paragraph if, as a result of any act or omission of said defendant, the property described in the

preceding paragraph, or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to or deposited with a third party; (c) has been placed beyond the jurisdiction of the Court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION TWO

[18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)]

1.    Pursuant to Rule 32.2 of the Federal Rules of Criminal Procedure, notice is hereby given that the United States of America will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Twenty-Two through Twenty-Seven of this First Superseding Indictment.

2.    Any defendant so convicted shall forfeit to the United States of America the following:

(a)  All right, title, and interest in any and all property, real or personal, constituting, or derived from, any proceeds traceable to any of the offenses; and

(b)  To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3.    Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), any defendant so convicted shall forfeit substitute property, up to the value of the property described in the preceding paragraph if, as the result of any act or omission of said defendant, the property described in the preceding paragraph or any portion thereof (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.

FORFEITURE ALLEGATION THREE

[18 U.S.C. § 982 and 28 U.S.C. § 2461(c)]

1. Pursuant to Rule 32.2(a) of the Federal Rules of Criminal Procedure, notice is hereby given that the United States will seek forfeiture as part of any sentence, pursuant to Title 18, United States Code, Section 982(a)(1) and Title 28, United States Code, Section 2461(c), in the event of any defendant's conviction of the offenses set forth in any of Counts Fifty through Fifty-Three of this First Superseding Indictment.

2. Any defendant so convicted shall forfeit to the United States of America the following:

(a) Any property, real or personal, involved in such offense, and any property traceable to such property; and

(b) To the extent such property is not available for forfeiture, a sum of money equal to the total value of the property described in subparagraph (a).

3. Pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b)(1), and Title 18, United States Code, Section 982(b)(2), any defendant so convicted shall forfeit substitute property, if, by any act or omission of said defendant, the property described in the preceding paragraph, or any portion thereof: (a) cannot be located upon the exercise of due diligence; (b) has been transferred, sold to, or deposited with a third party; (c) has been placed beyond the

43

jurisdiction of the court; (d) has been substantially diminished in value; or (e) has been commingled with other property that cannot be divided without difficulty.  Substitution of assets shall not be ordered, however, where the convicted defendant acted merely as an intermediary who handled but did not retain the property in the course of the money laundering offense unless the defendant, in committing the offense or offenses giving rise to the forfeiture, conducted three or more separate transactions involving a total of $100,000.00 or more in any twelve-month period.

A TRUE BILL

/S/

Foreperson

NICOLA T. HANNA
United States Attorney

BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division

JOSEPH O. JOHNS
Assistant United States Attorney
Chief, Environmental and Community
Safety Crimes Section

MONICA E. TAIT
Assistant United States Attorney
Deputy Chief, Major Frauds Section

PAUL G. STERN
Assistant United States Attorney
Senior Trial Attorney
Environmental and Community Safety
Crimes Section

DAVID H. CHAO
Assistant United States Attorney
Major Frauds Section